487 A.2d 346

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Robert BRICKER, Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 10, 1984.

Decided Feb. 13, 1985.

Reargument Denied April 10, 1985.

Lawrence J. O'Toole, Jr., North Versailles, for appellant.

Robert E. Colville, Dist. Atty., Robert L. Eberhardt, Deputy Dist. Atty., Melinda G. Tell, Asst. Dist. Atty., Pittsburgh, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION ANNOUNCING THE JUDGMENT
## OF THE COURT

ZAPPALA, Justice.

Appellant, Robert ("Codfish") Bricker, appeals a judgment of sentence of death for murder of the first degree imposed by the Court of Common Pleas of Allegheny County.

Appellant was charged in connection with the death of Thomas Sacco. The record indicates that Sacco was shot and killed by Miles Gabler on March 25, 1979 at approximately 1:00 a.m. at an after-hours club in the City of Pittsburgh. The Commonwealth's evidence indicated that Gabler had been solicited by the Appellant to shoot Sacco. The record further indicates that Sacco was conspiring with William ("Eggie") Prosdocimo in an illegal drug operation in Pittsburgh and that Sacco was employed by Prosdocimo as one of his dealers. Ill feelings appeared to develop between Prosdocimo and Sacco due to Sacco's apparent financial indebtedness to Prosdocimo. As a result, Prosdocimo stopped utilizing Sacco as a drug dealer. These ill feelings continued to mount between the parties. Subsequently, the record indicates that Sacco became a police informant against Prosdocimo. The Commonwealth's theory was that on becoming aware of this, a plot was conceived by the Appellant, Prosdocimo and Gabler to kill Sacco. As part of this conspiracy, the Appellant was to receive Sacco's drug territory. In furtherance of the plot, Sacco was to be lured to the scene of the actual shooting by a promise of a drug delivery. The record clearly indicates that the Appellant denied any involvement either as to the conspiracy or as to the actual murder. Contra, Gabler, one of the admitted conspirators, candidly conceded shooting Sacco. Gabler steadfastly denied any involvement of the Appellant.

Appellant alleges various grounds for a new trial and challenges the validity of the death sentence. One of the grounds advanced for a new trial is based upon various alleged instances of prosecutorial misconduct during the

course of the trial. Some of these occurred during the cross-examination of Charles Bonasorte, a defense witness. Bonasorte, a bar owner, was called to contradict testimony that the alleged conspirators in the Sacco murder had held a meeting in his bar. The prosecutor opened his cross-examination by asking Bonasorte, "How's the drug business?". [N.T. Vol. 3, p. 53] On objection by defense counsel, the court ordered the prosecutor to rephrase the question. The cross-examination then continued as follows:

Q. The Judge asked me to rephrase the question, Mr. Bonasorte, so we will rephrase.

Do you deal drugs from Eggie Prosdocimo?

A. No.

Q. Ever deal drugs?

A. Look on my record, no.

Q. I don't want to look at the record. Did you ever deal drugs?

A. No.

[N.T. Vol. 3, p. 56] There was no evidence that Bonasorte dealt in drugs.

Bonasorte testified that after closing his own bar, he would always go to Butchie's, an after-hours club in Pittsburgh. Bonasorte testified that on the night in question he went to Butchie's, but decided to go to a different bar after seeing a crowd and learning of Sacco's death. He further testified that he was not sure as to what time he closed his bar, but thought it was between 12:30 and 1:15 a.m. He indicated that it was a slow night and that his closing time varied according to the amount of business.

The prosecution tried to advance as part of its case that Bonasorte had closed the bar earlier than indicated. This led to another alleged instance of prosecutorial misconduct during the cross-examination. Appellant claims that the prosecutor improperly expressed a personal opinion as to the truth of Bonasorte's testimony. The relevant part of the cross-examination is as follows:

Q. What time did you usually close your bar?

A. It all depended. If I had a decent crowd I would lock the door and stay all night.

Q. You wouldn't have any reason to close it 12:30 on the night of the Sacco murder?

A. I stayed there late a lot of nights and put a lot of hours. I would run out of there on weeknights. Monday and Tuesday nights when they were weekends and Thursday night I would get out early. We had Friday and Saturdays I would stay as long as I can.

Q. My question was, you would not have any special reason to close early on the night of the Sacco murder, would you have?

A. No.

Q. Not the fact that you knew Prosdocimo was coming out there with Bricker and Gabler?

A. No.

Q. That's a lie.

A. Prove it.

Q. Prove it. That's what we are here for.

A. Yes, sir.

MR. HILNER: I think that we can get along a lot better if Mr. Lees observes just a few rules of common courtesy. I don't think he needs to call the witness a liar. The credibility of all witnesses is for the jury.

[N.T. Vol. 3, pp. 63–64]

After a post-trial hearing, the trial court ordered that the transcript be amended to show that the prosecutor's statement, "That's a lie." was an interrogatory sentence and not a declaratory sentence. [Trial court opinion at 6] It appears from a review of the transcript, however, that the lower court abused its discretion in permitting the amendment.

The third incident of which the Appellant complains occurred during the prosecutor's attempt to shake Bonasorte's testimony. Bonasorte testified that he knew Charles Kellington's testimony at a June, 1981 preliminary

hearing was false. He had not disclosed such information previously. The following exchange ensued:

Q. When did you tell Bricker?

A. When I heard that he said that they were in my bar and I said that's a damn lie. I said I think it's out of line. Excuse me for swearing.

Q. I want the jury to understand this.

A. I want to look at the jury.

Q. You look at them. Look them in the eye because they're staring at you. You tell Bricker in June of 1981, hey Bob, I got information Kellington is lying. Right?

A. No, he knew.

[N.T. Vol. 3, p. 61] No objection was made by defense counsel; however, appellate counsel has raised the issue of the propriety of the prosecutor's statement.

The conduct of the prosecutor does not present this Court with a novel question. Rather, the prosecutor's actions demonstrate a blatant disregard for the long-standing principles which have been enunciated by this Court.

A prosecutor must limit statements to facts in evidence and legitimate inferences therefrom, *Commonwealth v. Harvell*, 458 Pa. 406, 327 A.2d 27 (1974). In *Commonwealth v. Adkins*, 468 Pa. 465, 364 A.2d 287 (1976), we required a new trial where the prosecutor in his closing argument ascribed to a homicide defendant a motive that could not reasonably be drawn from the evidence. Although *Adkins* involved remarks made during the closing argument, its import is not limited to that stage of the trial. A prosecutor must act properly throughout the trial. This is illustrated by *Commonwealth v. Collins*, 462 Pa. 495, 341 A.2d 492 (1975) in which we reversed a conviction on the basis of prosecutorial misconduct at various points in the trial of a homicide case. The misconduct included arguments that were not supported by the record indicating that the victim died a slow and painful death. It also included attempts in the course of trial to try the defendant as a

drug pusher, although that was not an issue, and the defendant had admitted his occupation. It was improper under the circumstances to impugn the defendant on the basis of involvement with drugs.

■ In the instant case, the prosecutor similarly attempted to impugn Bonasorte. Although drug dealing was relevant in this case as a backdrop, it was improper to impeach Bonasorte in that fashion, as there was no evidence of involvement on his part in the drug business. This case is similar to *Adkins* and *Collins* in that the prosecutor injected an improper issue into the case.

■ It is misconduct for a prosecutor to express a personal opinion of a defendant's guilt or credibility. *Commonwealth v. Cherry*, 474 Pa. 295, 378 A.2d 800 (1977); *Commonwealth v. Revty*, 448 Pa. 512, 295 A.2d 300 (1972) [prosecutor's closing statement that defendant was attempting to deceive the jury in his claim of self-defense]; *Commonwealth v. Potter*, 445 Pa. 284, 285 A.2d 492 (1971) [new trial awarded where prosecutor suggested on cross-examination that the defendant's testimony was a "malicious lie"].

■ This prohibition has not been limited to comments upon a defendant's testimony. It applies to defense witnesses as well. In *Commonwealth v. Toth*, 455 Pa. 154, 314 A.2d 275 (1974), we held it was reversible error for the prosecutor to state in his closing argument that not even the defense counsel believed a defense witness. We find in the instant case that it was improper for the prosecutor to express a personal opinion on Bonasorte's credibility while cross-examining him by saying of his testimony "That's a lie". Similarly, we find that the prosecutor's admonition to Bonasorte to look the jury in the eye was an improper expression of an opinion on credibility.

It is undisputed that Gabler, and not Appellant, was the actual killer of Sacco. The prosecution's case depended on proving that Appellant was involved in a conspiracy. The claim of the alleged meeting in Bonasorte's bar between

Appellant, Gabler and Prosdocimo was part of the case to establish the conspiracy. Bonasorte's testimony that the meeting did not occur was important to Appellant's case. The prosecutor's statements that Bonasorte was in the drug business, was lying about his activities on the night of the murder, and was otherwise not credible, prevented the jury from evaluating the testimony fairly.

Appellant also alleges misconduct involving reference to prior criminal activity on his part. Appellant was sentenced to two and one-half to five years in prison for armed robbery in 1961. In 1964, he was sentenced to life imprisonment for first degree murder and was released in 1974. The Commonwealth called Charles Rossi as a witness. Rossi had a criminal record, which the Commonwealth brought out as follows:

Q. Mr. Rossi, I would like to familiarize the jury a little bit about your background for a second before we go on.

Let's begin with your criminal record. When is the first time you received or were convicted of a crime and received a period of incarceration in your adult life?

A. In 1941.

Q. And how long did you serve?

A. 11 months.

Q. And what was that for?

A. Automobile larceny.

Q. Automobile larceny in '41 and '42, an 11-months period?

A. Yes.

Q. And what did you go into jail in '43 for?

A. Armed robbery of a gambling establishment.

Q. Where was that gambling establishment?

A. At Wheeling, West Virginia.

Q. And did you go to prison in Wheeling or West Virginia.

A. I went to the West Virginia state penitentiary (sic) at Moundsville.

Q. And you went in in 1943?

A. That is true.

Q. And when did you get out?

A. I got out in 1956.

Q. You were in from '41 to '42 and then from '43 to '56?

A. That is true.

Q. And you got out in '56.

A. Yes.

Q. When is the next time you went to jail?

A. 1959.

Q. For what?

A. Murder.

Q. What kind of murder?

A. First degree.

Q. Were you the shooter or the trigger man in that case.

A. I was the accomplice.

Q. How long did you serve in prison that time?

A. 16 years.

Q. Did you get a life sentence in that case?

A. Yes.

Q. What year did you get out?

A. 1974, in August.

Q. '41, '42, '43 to '56 and '59 to '74?

A. That is true.

[N.T. Vol. 2, pp. 148–149] The witness answered questions about his background, said he knew Appellant, and identified him. The testimony then continued as follows:

Q. Have you known Mr. Bricker for a substantial period of time?

A. About 20 years.

[N.T. Vol. 2, p. 150] Appellant objected to the testimony on the basis of improper reference to prior criminal conduct. He argued that since the witness was in prison, he would have had to have known Appellant there. That would indicate that Appellant was in prison, which in turn would indicate that he committed a crime. Appellant objected on

the basis also of prosecutorial misconduct, in that the prosecutor intentionally brought out improper testimony.

■ Evidence of other unrelated criminal conduct of an accused is generally inadmissible. *Commonwealth v. Travaglia*, 502 Pa. 474, 467 A.2d 288 (1983). Evidence of other crimes may be introduced in limited circumstances. It is admissible to show a common scheme, plan, or design such that proof of one crime tends to prove others, or to establish the identity of the defendant, *Commonwealth v. Boykin*, 450 Pa. 25, 298 A.2d 258 (1972). It is admissible to show motive, *Commonwealth v. Chism*, 480 Pa. 233, 389 A.2d 1041 (1978). The limited circumstances under which evidence of other crimes is admissible are not present in the instant case.

■ The rule against evidence of other crimes may be violated by testimony explicitly describing an act that constitutes a crime, *Commonwealth v. Foose*, 441 Pa. 173, 272 A.2d 452 (1971). It may also be violated by testimony that implies that the defendant was involved in criminal activity although not describing a particular crime. In *Commonwealth v. Groce*, 452 Pa. 15, 303 A.2d 917 (1973), a police officer testified that he was familiar with the defendant from police files and through his previous work as an officer. We held that the jury could reasonably infer from such remarks that the defendant had a prior criminal record and that the evidence probably had an influence on the verdict. On that basis, we ordered a new trial. Similarly, it was held improper to refer to photographs of the defendant being in possession of the police, *Commonwealth v. Allen*, 448 Pa. 177, 292 A.2d 373 (1972). Testimonial reference to a defendant having been in prison violates the rule against evidence of prior crimes. *Commonwealth v. Washington*, 488 Pa. 133, 411 A.2d 490 (1980).

■ Revelation by a prosecutor of prior criminal activity in addition to being improper as a matter of evidentiary law, may be a basis for a finding of misconduct. In *Commonwealth v. Percell*, 499 Pa. 589, 592, 454 A.2d 542, 544 (1982),

we stated that "[a] reference, either expressly or by reasonable implication, to prior criminal activity, which does not qualify as a recognized exception to the general rule excluding evidence of an accused's prior criminal convictions ... is impermissible." In addition to finding that the improper reference was made to prior criminal conduct, we found that the prosecutor engaged in misconduct by deliberately injecting an improper matter into the case. We referred to standard 3–5.6(b) of the ABA Standards for the Prosecution and Defense Function, which provides that

It is unprofessional conduct for a prosecutor knowingly and for the purpose of bringing inadmissible matter to the attention of the judge or jury to offer inadmissible evidence, ask legally objectionable questions, or make other impermissible comments or arguments in the presence of the judge or jury.

In the instant case, the testimony of Rossi, following the completion of the questioning on his background, centered on his relationship with Appellant after being released from prison in 1974. Rossi testified that he saw Appellant regularly during the period subsequent thereto and that in September, 1979, Appellant told him he had hired Gabler to kill Sacco and intended to kill Gabler later. Rossi's acquaintance with Appellant while in prison had no bearing on that. Testimony thereon was not necessary to the prosecution's case and served no legitimate purpose. Rossi's statement that he knew Appellant for twenty years showed that he knew Appellant while in prison. The jury could reasonably have inferred that Appellant was in prison and therefore committed a crime. We find that the testimony violated the rule against evidence of prior crimes and that it was prejudicial error to allow it.

Where, as here, the prosecutor is aware that evidence is not admissible and is prejudicial to the defendant, the prosecutor has engaged in misconduct by deliberately questioning on an improper matter. A prosecutor should not seek creative methods by which to circumvent the clear dictates of this Court. By doing so, a prosecutor does a

disservice to his profession and to the courts which ensure the constitutional rights of all individuals. Neither public pressure nor a perceived thrill of courtroom dramatics may take precedence over the guarantee of constitutional rights.

Appellant alleges another incident of misconduct involving the testimony of Commonwealth witness Charles Kellington. Kellington testified to having been offered $1,500.00 by Prosdocimo to beat up Sacco and to having told Sacco about it. He also testified to having heard Appellant, Prosdocimo, and Gabler discussing their plot to kill Sacco. When questioned on cross-examination as to why he did not tell Sacco about that, he said

> Well, in that two month period, I told him about the 15 hundred dollars, and by then I knew Bricker was a coldblooded killer, and I wasn't about to get killed for Tommy Sacco.

[N.T. Vol. 2, p. 116] Appellant complains about the cold blooded killer remark itself and about the prosecutor's exploitation of it in his closing argument.

> Finally, one point that Mr. Hilner raised with respect to the Commonwealth's evidence—and we are only talking about the Commonwealth's evidence now—he said to you "Why didn't Kellington warn Tommy Sacco".
>
> Why didn't he warn him? Why when he was sitting there at the table didn't he nudge him and say "Tommy, I don't think it is a good idea for you to go out in the street"?
>
> Why didn't he do that? Well Mr. Hilner respectfully asked Chuckie Kellington that question. Mr. Hilner told you his question, but he did not tell you what Kellington's answer was.
>
> What Kellington told you—and this is my recollection—obviously you have to rely on your own recollection—
>
> But he told you that the fight up on Winterburn Street was in the midsummer. He told you on that occasion he was offered 15 hundred dollars to "Fuck up" on Tommy Sacco by Prosdocimo and on that occasion he told Sacco,

"Hey, you better watch yourself, this guy offered me 15 hundred dollars to mess you up".

Sacco's reaction was he got mad at Kellington. He now thinks Kellington is with Prosdocimo and he gets mad. What does Sacco do? He goes right back and tells Prosdocimo which gets Kellington into trouble.

All right, Sacco is now saying, "Hey, Kellington told me you offered him 15 hundred dollars to mess me up and blah blah blah blah".

All right. Obviously Prosdocimo then jumps in Kellington's face, "What the hell are you telling Sacco I offered you that money for?" And so with him telling Kellington that, he said, "I had to deny it and all that."

A couple of months pass between that incident and the Sacco murder, and now Kellington is testifying that he had direct knowledge of a plot to kill Sacco.

Mr. Hilner stands up in front of you and he says "Why didn't he tell Sacco this time?

Well, what did Kellington tell you? His specific answer was "Because I was afraid. I knew by that time, in that intervening two-month period, that the defendant Robert Bricker was a coldblooded killer".

MR. HILNER: Objection, your Honor.

[N.T. Vol. 4, pp. 81–82]

▉ We have held that it was reversible error to allow the prosecutor to point to a murder defendant in his closing argument and refer to him as a cold blooded killer, *Commonwealth v. Capalla*, 322 Pa. 200, 185 A. 203 (1936). We disapproved of language identical to that complained of here. "The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury," standard 5.8(c), ABA Standards for the Prosecution Function and the Defense Function (approved draft 1971), cited in *Commonwealth v. Toney*, 474 Pa. 243, 378 A.2d 310 (1977). The reference to Appellant as a cold blooded killer was undesirable when made by the witness. For the prosecutor to refer to it in his closing and quote it verbatim rises to the level of misconduct.

The Appellant urges as a further indication of misconduct that certain remarks in the prosecutor's closing argument were improper. One of these remarks was made while the prosecutor was referring to the testimony of Bonasorte. The challenged remark was

You notice when Bonasorte left the stand, he pointed at me and said "I will see you later." Maybe he will.

[N.T. Vol. 4, p. 91] Following trial counsel's objection, the judge instructed the jury to disregard the statement. Subsequently, the lower court allowed the amendment of the record on the Commonwealth's petition to show that the threat referred to by the prosecutor was in fact made by Bonasorte.

Later in the closing the prosecutor, referring to Gabler's testimony exonerating Appellant and impugning two Commonwealth witnesses, said "He is the man who nailed the Commonwealth to the wall. Don't let him do it". [N.T. Vol. 4, p. 90] Also, the prosecutor made remarks implying that the defense used its right of discovery to present false testimony. The prosecutor remarked as follows:

And I remind you as Mr. Hilner pointed out to you, that defendants get complete discovery. They get the homicide file, they get the statements, they get to review it.

Mr. Gabler had all that information available to him before he sat down and discussed the case with Bricker and with Prosdocimo. So you would expect his story to be perfect, because you can put it together from the information you get.

And it is very difficult to shoot down a fabricated story. But if you use your common sense in this case, there will be no doubt in your mind that it is fabricated.

[N.T. Vol. 4, p. 91] We find that these remarks violate the rules set forth above that a prosecutor must limit statements to facts in evidence and reasonable inferences therefrom and must not express personal opinions on guilt, credibility, or strategy.

 In *Commonwealth v. Collins, supra,* the prosecutor engaged in a pattern of misconduct throughout the trial. We used that as a basis to find reversible error. In the Appellant's case, repeated instances of misconduct permeated the entire proceeding so as to effectively deny him a fair trial. We also held in *Collins* that the prosecution has the burden to establish that its misconduct was harmless beyond a reasonable doubt. That burden is not met in the instant case, in view of the repeated prejudicial remarks.

 Appellant alleges various instances of ineffectiveness on the part of trial counsel. The only ones which need be discussed here are those pertaining to prosecutorial misconduct. Defense counsel did not object to the prosecutor's admonition to Bonasorte to look the jury in the eye, his reference in closing to Gabler nailing the Commonwealth to the wall, or his suggestion that the defense used its right of discovery to fabricate a story. There is no ineffectiveness if counsel's decisions have a reasonable basis designed to effectuate the client's interests, *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967). In *Commonwealth v. Caesar,* 478 Pa. 575, 387 A.2d 471 (1978), we found counsel ineffective in failing to raise the issue of improper remarks by the prosecutor. In the instant case, we find that the remarks of the prosecutor referred to *supra* were improper. They were part of a pattern of misconduct to which objections should have been made. We find that counsel was ineffective in not doing so.

Appellant also argues that the prosecutor asked improper questions while cross-examining Gabler, that the court improperly refused to record sidebar discussions, that evidence on Prosdocimo's involvement in the drug business was erroneously admitted, that discovery requested by the defense was improperly denied, that the Commonwealth presented an incompetent witness in bad faith, that the death sentence was disproportionate to the circumstances of the case, and that the death penalty statute violated the prohibition of cruel and unusual punishment. Because of

our finding on the question of prosecutorial misconduct, it is not necessary to decide these issues.

The judgment of sentence is reversed, and the case is remanded to the Court of Common Pleas for a new trial.

HUTCHINSON, J., filed a concurring opinion.

LARSEN, J., concurred in the result.

FLAHERTY, J., filed a dissenting opinion in which McDERMOTT and PAPADAKOS, JJ., joined.

HUTCHINSON, Justice, concurring.

I concur in the result the majority reaches in this case because I believe the trial court's failure to record and transcribe the side-bar conferences has not provided this Court with a "full transcript or other equivalent picture of the trial proceedings." *Commonwealth v. Shields,* 477 Pa. 105, 108, 383 A.2d 844, 846 (1978). *See also Entsminger v. Iowa,* 386 U.S. 748, 87 S.Ct. 1402, 18 L.Ed.2d 501 (1967) ("clerk's transcript" containing only the information or indictment, the grand jury minutes, the bailiff's oath, statements and instructions, and various orders and judgment entries of the court, but not a transcript of the evidence, briefs or arguments of counsel does not meet constitutional requirements binding on a state in administering its appellate criminal procedures). Such a trial transcript does not comport with either the applicable constitutional standards or with Pa.R.Crim.P. 9030. That rule provides, in relevant part:

Rule 9030. Recording and Transcribing Court Proceedings

(a) In court cases, after a defendant has been held for court, proceedings in open court shall be recorded.

(b) Upon the motion of any party, upon its own motion, or as required by law, the court shall determine and designate those portions of the record, if any, which are to be transcribed.

. . . .

As I read this rule, the recording of all proceedings held in open court is mandatory. I believe that compliance with this rule is of the utmost importance in capital cases such as the present one, where our *de novo* review makes a complete record of the trial proceedings absolutely essential.

Because there are no transcripts of the side-bar conferences, I cannot make a judgment on appellant's allegations of ineffective assistance of trial counsel and prosecutorial misconduct. Without their transcription, it is not possible to say to what extent the prosecutor failed to follow the guidelines or instructions of the trial judge, or to what extent defense counsel adequately objected to the perceived misconduct of the prosecutor. Since effective appellate review seems to me precluded by the deficiencies in the transcript, to which appellant has a constitutional right, I concur with the majority's mandate directing a new trial in this case.

FLAHERTY, Justice, dissenting.

I dissent. The opinion authored by Mr. Justice Zappala construes as conduct warranting a new trial actions of the prosecutor which did not rise to the level of misconduct that would have significantly undermined the fairness of appellant's trial.

The prosecutor's cross-examination of defense witness Bonasorte, whereby an inference was created that Bonasorte was involved with an illegal drug business, was not sufficiently prejudicial as to warrant a new trial. Further, the prosecutor's expression, "That's a lie," made to Bonasorte during a portion of the cross-examination, was shown by the record to have been issued in an interrogatory manner, rather than in a declaratory fashion; thus, it did not constitute a seriously prejudicial expression of opinion as to the witness' veracity. Similarly, the prosecutor's comment that Bonasorte should look the jurors in the eye, because the jurors were staring at him, was not improper, under the circumstances, for the record reveals that the

comment was made in response to Bonasorte's request, "I want to look at the jury."

There is no basis for the assertion that the prosecutor inferred that appellant had served time in prison for prior crimes. The prosecutor merely introduced evidence that one of the defense witnesses, Rossi, who had known appellant for 20 years, had been in prison for various periods during those 20 years. The mere fact that appellant knew someone who had been imprisoned is not evidence that appellant too had served time, and it is unreasonable to assume that only persons with records of criminal convictions could be acquainted with individuals who have served time in prison.

Commonwealth witness Kellington testified that he did not warn Sacco of a plot against his life. Kellington stated that he was afraid to warn Sacco because of possible retribution from appellant, whom Kellington described as being a "coldblooded killer". Kellington was, by this reference, merely explaining the basis for his fear, and without this reference Kellington's explanation of the basis for his actions would have been an inadequate one. In closing argument, the prosecutor did not express an opinion that appellant was a "coldblooded killer," but rather merely quoted testimony that had already been presented to the jury, which involved a relevant issue.

The prosecutor, in closing, also called to the jury's attention the fact that Bonasorte, upon leaving the witness stand, threatened the prosecutor. Since the record shows that the threat was in fact made, appellant was not unfairly prejudiced by the comment. Finally, the prosecutor's comment upon defense witness Gabler's testimony, whereby the prosecutor said, "He is the man who nailed the Commonwealth to the wall. Don't let him do it," was improper, but not sufficiently prejudicial as to warrant a new trial.

I would, therefore, affirm the judgment of sentence.

McDERMOTT and PAPADAKOS join this dissenting opinion.